**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-14355-CIV-MARTINEZ/MAYNARD**

**JEROD RODRIGUEZ,**

      **Petitioner,**

**v.**

**SECRETARY OF THE FLORIDA DEPARTMENT OF CORRECTIONS,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION ON PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY (DE 1)

**THIS CAUSE** comes before this Court upon an Order of Reference (DE 4) and the above Petition. The record before this Court consists of the Petition and Memorandum (DE 1); the Respondent's Response (DE 8), Appendix (DE 9), and Supplement (DE 16-1); and the Reply (DE 14). This Court recommends denial of habeas relief for reasons set forth below:

## BACKGROUND

The charges against Petitioner stem from allegations that in May of 2003 he burglarized the home of Mr. Larry Hopkins ("Hopkins") in Port Saint Lucie, Florida while armed and wearing a mask, and held Hopkins and his son, Christopher, at gunpoint while he robbed Hopkins of a few hundred dollars and a Rolex watch (DE 16-1 at 318-325, 328, 382). Count 1 of the Complaint alleged that he committed robbery with a firearm while wearing a mask (DE 9-1 at 7). Count 2 charged that he committed burglary of a dwelling with an assault while armed and wearing a mask. *Id.*

**A.** *__The Trial__*

On December 15, 2004, Judge Burton C. Conner called the criminal case for trial (DE 16-1 at 1, 285-824). The government called eight witnesses: 1) Master Sheriff's Deputy Scott DeMichael (*Id.* at 306); 2) victim Larry Hopkins (*Id.* at 318); 3) victim Christopher Hopkins, sixteen-years old at time of incident and son of Larry Hopkins (*Id.* at 449); 4) Master Sheriff's Deputy James Mullins (*Id.* at 475); 5) Ms. Lacey Coker, eight- to nine- year girlfriend of Petitioner's childhood friend, Johnny Rodriguez (*Id.* at 480); 6) Johnny Rodriguez, Petitioner's friend since they were both ten-years old (*Id.* at 489); 7) Detective Mark Colangelo with the St. Lucie County Sheriff's Office (*Id.* at 549); and 8) Detective Neil Spector with the St. Lucie County Sheriff's Office (*Id.* at 595).

Deputy Scott DeMichael ("DeMichael") responded to Hopkins' 911 call reporting a robbery in the early morning hours of May 31, 2003. *Id.* at 307. Upon arrival at the Hopkins' home, he saw Hopkins and his son, Christopher, sitting in a truck in their driveway. *Id.* at 308. DeMichael noted that they were scared, covered with pepper spray, and that Hopkins had electrical wire wrapped around one of his wrists. *Id.* DeMichael testified that the case was turned over to Detective Mark Colangelo after the preliminary investigation. *Id.* at 309.

Hopkins testified that Petitioner and two others, all wearing masks, broke into his home, held him and his son, Christopher, at gunpoint, sprayed them with pepper spray, robbed him of money and a Rolex watch, and tied him and his son up with speaker wire before leaving. *Id.* at 318-34. Hopkins said that, when Petitioner asked him "where's the money" through gritted teeth, he recognized Petitioner by voice. *Id.* at 322. He did not confront Petitioner because he feared for his life. *Id.* at 323. Hopkins also authenticated the audio tape of the 911 call he made immediately following the burglary, which was published to the jury. *Id.* at 332-33. During that call, Hopkins

reported to the 911 dispatcher that his Rolex watch and some money was taken, and he said he "[had] an idea who it [was]." *Id.* at 335-36.  Hopkins gave the 911 dispatcher a phone number telling them to "[c]all this girl, it's her boyfriend that comes down from Orlando."  Right after the burglary, Hopkins reported to law enforcement that he was receiving phone calls from the Petitioner, and law enforcement arranged for Hopkins to tape the calls with the goal of getting Petitioner to return Hopkins' Rolex watch to him. *Id.* at 341-71.  During these calls, Petitioner denied taking Hopkins' watch multiple times. *Id.* at 350-51, 361.  At one point, Petitioner declared, "I have no watch at all." *Id.* at 363.  Two other times, in response to Hopkins' repeated requests to get his watch back, Petitioner first said, "I cannot give you nothing I do not have," *Id.* at 366, and then he said, "I don't have nothing." *Id.* at 367.  Moreover, Petitioner told Hopkins on one of the calls that he was at Johnny Rodriguez's house at the time of the burglary. *Id.* at 354-55.

Sixteen year old Christopher testified that he was in the living room watching television when three guys wearing masks came into the room through the kitchen. *Id.* at 449-63.  Christopher reported that one of the men pointed a gun at him while another sprayed him with mace. *Id.* at 452-55.  Although his eyes were burning and he could not see, Christopher recognized Petitioner's voice immediately when he heard Petitioner ask his father "where's the money." *Id.* at 457, 460.  He also recognized Petitioner's voice when Petitioner communicated with the other perpetrators. *Id.* at 460-61.  The intruders guided Christopher to his father's bedroom where they tied him up and laid him on the floor. *Id.* at 458-59.  After the burglars left them, Christopher's father got free of his restraints, untied Christopher, and made the 911 call. *Id.* at 461-62.

Ms. Lacey Coker testified that Petitioner was at her residence on May 30, 2003—the night before the robbery—from around 7:30 p.m. until between 9:30 p.m. and 11:30 p.m. *Id.* at 480-83.  The next morning she overheard a phone call Petitioner made to her boyfriend, Johnny Rodriguez

(no relation), at around 8:30 a.m. asking that she and Johnny tell law enforcement that Petitioner was with them later than he actually was with them.  *Id.* at 484-85.

Mr. Johnny Rodriguez ("Johnny"), a Saint Lucie County resident, confirmed the testimony of his girlfriend, Lacey Coker, stating that Petitioner, Petitioner's little brother, and another friend were at their residence on the evening of May 30, 2003.  *Id.* at 489-92.  Johnny testified that all three left around 10 p.m. to 10:30 p.m., and Petitioner was not with him at 12:30 p.m. as Petitioner wanted him to say.  *Id.* at 492, 540.  Johnny also confirmed that Petitioner called him the next morning around 8:30 a.m.  *Id.* at 492.  During that call, Petitioner told Johnny that he needed an alibi for the night before because "he was going to be blamed for something."  *Id.*  Petitioner asked Johnny to say that he was at Johnny's home all night.  *Id.*  Petitioner also called Johnny from jail the first day of his arrest, and these calls were recorded.  *Id.* at 496.  An audio tape of one of these calls was played for the jury:

JEROD RODRIGUEZ:  And I left your house about 9:00, went to Chris – I went to my girlfriend's house (indiscernible).

JOHN RODRIGUEZ:  Yeah.

JEROD RODRIGUEZ:  And then I left my girlfriend's house—I got back at your house about 12:15, remember I got to your house at 12:15?

JOHN RODRIGUEZ:  Yeah, and you left my house 1:15 – 1:30.

JEROD RODRIGUEZ:  Right, exactly.  Right, and Lacey knows that, too, right?

JOHN RODRIGUEZ:  Yeah.

*Id.* at 498.  Johnny also facilitated a number of three-way calls so that Petitioner could talk to others.  *Id.* at 499, 541.  On one of those calls, Petitioner directed his father to dig up a plastic bag in their backyard, and to "clean the money off, [because] it probably has a little bit of dirt on it . .

. [but] don't touch it." *Id.* at 514-22.  At Petitioner's instruction, Johnny called Petitioner's parents

back to explain that they needed to take the watch that was in the plastic bag to victim Hopkins.

*Id.* at 536, 539.  Petitioner wanted the watch returned because he believed Hopkins would not press

charges against him if he returned the watch.  *Id.* at 534-36.

Detective Mark Colangelo ("Colangelo") testified that the incident at the Hopkins' home

happened at 12:40 a.m. on May 31, 2003, and he arrived on the scene about 1:30 a.m.  *Id.* at 550-

51.  Colangelo further testified that Hopkins immediately identified Petitioner as one of the

intruders.  As part of his investigation that night, Colangelo called Petitioner's girlfriend, Christy

Ferguson, in Port Saint Lucie and called a residential number in Orlando trying to locate Petitioner

with no success.  *Id.* at 551-52.  Colangelo later provided Hopkins with a tape recorder to record

phone calls from Petitioner.  *Id.* at 553-54.  Part of the plan was to get Petitioner to return the watch

to Hopkins.  *Id.* at 445.

Colangelo additionally testified that he interviewed Petitioner on June 9, 2003.  Post

*Miranda*, Petitioner said that on the night of the incident he left the home of his girlfriend, Christy,

before midnight and drove to Orlando.  *Id.* at 554-56.  Petitioner said he had problems with the

truck he was driving that night and had to drive really slowly to get back to Orlando, which is why

the drive took him over four hours to complete and why he did not call victim Hopkins back until

4:00 a.m. that next morning.  *Id.* at 555-56. The next day, however, Petitioner changed his story.

Petitioner returned to the Sheriff's Office on June 10, 2003 and spoke to law enforcement.  *Id.* at

500, 556-57.  Petitioner's second story was that he was at Johnny and Lacey's house early in the

evening, went to Christy's house for a while and then returned to Johnny's house where he stayed

until 2:00 a.m.  *Id.* at 557-58.  Petitioner told Colangelo that Johnny would provide him with an

alibi.  *Id.* at 558.  Petitioner was then arrested.  *Id.* at 559.

According to Colangelo, victim Hopkins received a phone call from Christy on June 10, 2003 (the same day Petitioner was arrested).  Hopkins received his watch back that evening.  *Id.* at 560-61.

After the government rested (*Id.* at 612), the Defense called three witnesses:  1) Macario Rodriguez, Petitioner's father (*Id.* at 616); 2) Detective Colangelo, who provided expert testimony about the effects of pepper spray (*Id.* at 650-58), and 3) Timothy Hernandez, a four-time convicted felon and several year friend of Petitioner (*Id.* at 671-73).

Petitioner's father testified that he found Hopkins' watch in a plastic bag that he dug up in his backyard per Petitioner's "in code" instructions, that Christy called Hopkins to arrange the return of the watch, and that he drove down from Orlando to return the watch to Hopkins.  *Id.* at 616-18; 632-33.  He first saw the watch in Petitioner's room a couple days after a birthday party on May 9, 2003.  *Id.* at 646-47.  He also testified that the truck his son drove to Orlando the night of the incident had catalytic converter issues causing it not to drive over 20 miles per hour.  *Id.* at 621-22.

Timothy Hernandez ("Hernandez") testified that he attended a party on or about May 9, 2003 that was also attended by Petitioner and victim Hopkins.  *Id.* at 673-674.  At the gathering, Hernandez saw Petitioner wearing a Rolex watch. According to Hernandez, Petitioner received the watch from Hopkins after they went into the bathroom together.  *Id.* at 673-77.  The implication was that Hopkins gave Petitioner the watch at that event as part of a drug deal.  *Id.*

The jury found Petitioner guilty of both counts of armed robbery and burglary.  *Id.* at 819-20.  As a repeat offender, Petitioner was sentenced to life in prison on each count—to be served concurrently.  *Id.* at 853-855.

**B.** *__Direct Appeal__*

Assistant Public Defender Joseph R. Chloupek represented the Petitioner on the direct appeal that was filed on April 13, 2005 (DE 9-1 at 47-63).  On appeal, Petitioner complained that the trial court did not conduct an adequate inquiry into his motion to discharge counsel prior to sentencing.  *Id.* at 59.  Petitioner contended that trial counsel was ineffective and/or incompetent for failure to provide discovery materials to him and for failure to keep him properly informed regarding the status of his case and the evidence against him.  *Id.*  Because the trial court did not sufficiently inquire and address this charge, Petitioner argued that his sentences were improper. *Id.* at 58.  On December 7, 2005, Florida's Fourth District Court of Appeal ("Fourth DCA") *per curiam* affirmed Petitioner's convictions and sentences without a written opinion[1] (DE 9-1 at 84).  *Rodriquez* [*sic*] *v. State*, 916 So. 2d 807 (Fla.4th DCA 2005).  The Mandate was issued on December 23, 2005 (DE 9-1 at 86).

**C.** *__3.850 Motions__*

On March 6, 2007, Petitioner timely filed a Motion for Postconviction Relief pursuant to Florida Rule of Criminal Procedure 3.850[2] raising ten ineffective assistance of trial counsel claims (DE 9-1 at 88-100).  Also, on March 6, 2007, Petitioner filed a Motion for Leave to Amend Defendant's Postconviction Motion because counsel claimed to be in the process of investigating the case and still in the process of obtaining and reviewing public records.  *Id.* at 102.  The court

---

[1] "Under Florida law, the Florida Supreme Court lacks jurisdiction to hear an appeal from a per curiam affirmance of a conviction by a lower state appellate court." *Williams v. Sec'y, Fla. Dep't of Corr.*, 674 F. App'x 975, 976 (11th Cir. 2017) (citing *Jenkins v. State*, 385 So.2d 1356, 1359 (Fla. 1980)).

[2] Fla. R. Crim. P. 3.850, entitled Motion to Vacate, Set Aside, or Correct Sentence, provides a vehicle for collateral review of a criminal conviction. *Duncan v. Walker*, 533 U.S. 167, 177 (2001).  Florida generally requires defendants to raise ineffective assistance of counsel claims in these postconviction proceedings rather than on direct appeal. *Reynolds v. State*, 99 So.3d 459, 474 (Fla. 2012) ("claims of ineffective assistance of counsel generally are not cognizable on direct appeal and are properly raised in postconviction proceedings").

approved Petitioner's request for a 90-day extension on March 22, 2007 (*Id.* at 106) and a further 90-day extension on June 12, 2007. *Id.* at 113. On September 24, 2007, after another extension request, the court dismissed the original 3.850 motion "with leave to timely file a comprehensive amendment." *Id.* at 119. On December 13, 2007, Petitioner filed an Amended Motion for Postconviction Relief raising twelve ineffective assistance of trial counsel claims, one claim that his sentence was improperly determined and one claim for cumulative error. *Id.* at 16-144. Petitioner was represented by current counsel, Attorney Michael Ufferman. *Id.* at 144. On March 26, 2014, the postconviction court ordered the government to respond. *Id.* at 146-47. Following the government's response, the postconviction court dismissed in part Petitioner's amended 3.850 motion with leave to amend on March 5, 2015. *Id.* at 188-90. Petitioner filed another amended 3.850 motion on May 15, 2015. *Id.* at 193-203. On May 27, 2016, the Honorable Steven J. Levin dismissed in part, denied in part, and granted an evidentiary hearing in part on Petitioner's second amended 3.850 motion.[3] *Id.* at 231-36. The May 27, 2016 order by Judge Levin set a status hearing for August 16, 2016 presumably to establish a date for an evidentiary hearing. *Id.* at 235. The Certificate of Service included in Judge Levin's May 27, 2016 Order indicates that copies were sent to the address of Petitioner's counsel, Michael Ufferman. *Id.* at 236. Petitioner's counsel, however, claims he was not served with notice of the August 16, 2016 status hearing and therefore was not in attendance (DE 1 at 6-7). The postconviction court acknowledged Petitioner's immediate request to reschedule the August 16, 2016 hearing but declined to reschedule based upon its reconsideration of the pleadings. *Id.*

---

[3] Twelve of Petitioner's fourteen claims that were addressed in this order are the subject of the instant petition (DE 1 at 4; DE 9-1 at 235).

D. *3.850 Ruling and Appeal*

On September 1, 2016, Judge Levin denied Petitioner's 3.850 motion on its merits (DE 9-1 at 238-39).  The postconviction court explained that, after reconsidering its findings, it would deny all of Petitioner's outstanding claims based upon the two government responses.  *Id.* at 239. On April 11, 2017, Judge Levin denied Petitioner's Motion for Rehearing stating that Petitioner "provide[ed] nothing that [the court] overlooked or misapprehended, or that would cause [it] to change its findings."  *Id*. at 246.  On July 27, 2017, the Fourth DCA *per curiam* affirmed denial of Petitioner's request for postconviction relief, *Id.* at 309 ("PCA opinion"), and issued a Mandate on October 13, 2017.  *See* DE 9-1 at 338; *Rodriguez v. State*, 228 So. 3d 572 (Fla. 4th DCA 2017).

E. *Federal Habeas Petition*

Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on October 16, 2017.

## TIMELINESS AND EXHAUSTION

Under Title 28 of United States Code Section 2244, a state prisoner's application for a writ of habeas corpus is subject to a one-year period of limitation that runs from the "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  "The time for seeking direct review includes the 90-day window in which the petitioner could have petitioned the Supreme Court of the United States for a writ of certiorari*." Hall v. Sec'y, Dep't of Corr.*, 921 F.3d 983, 986 (11th Cir. 2019) (citation omitted).  However, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. §

2244(d)(2).  In other words, the one-year limitations period for filing a § 2254 petition is tolled during the pendency of a properly filed application for state postconviction relief.  *Hall v. Sec'y, Dep't of Corr.*, 921 F.3d 983, 986 (11th Cir. 2019).  Here, the Fourth DCA *per curiam* affirmed Petitioner's convictions and sentences on December 7, 2005.  *Rodriquez* [*sic*] *v. State*, 916 So. 2d 807 (Fla.4th DCA 2005).  Petitioner did not petition the Supreme Court of the United States for a writ of certiorari, and his convictions became final for the federal one-year limitation purposes on March 7, 2006.  Respondent is correct that Petitioner had until March 7, 2007 to file his federal habeas petition unless tolled.  DE 8 at 9; *Hall*, 921 F.3d at 985 (calculating the federal one-year limitation period as exactly one year from the date convictions and sentences become final).  Thus, Petitioner's 3.850 motion for postconviction relief that was filed on March 6, 2007 tolled the federal one-year limitation period one day prior to its deadline.

Respondent makes two arguments against the timeliness of Petitioner's federal habeas petition.  First, Respondent claims that Petitioner's original 3.850 motion was not properly filed because Petitioner was abusing state procedure by making a shell motion and then filing multiple extension requests for the filing of an amended 3.850 motion.  *Id.*  Properly filed, however, means that a filing has been made in compliance with governing filing requirements such as "the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee."  *Thompson v. Sec'y, Dep't of Corr.*, 595 F.3d 1233, 1236 (11th Cir. 2010) (citation and quotation omitted).  Here, there is no indication that Petitioner's original 3.850 motion was deficient in any of these respects.  Further, there is nothing in the record demonstrating that Petitioner was abusing state procedure by requesting extensions.  Petitioner's counsel explains that he was still in the process of obtaining and reviewing public records and that Petitioner was still sending him correspondence containing possible additional rule 3.850 motion claims.  DE 14

at 3. Therefore, Petitioner's original 3.850 motion should be deemed "properly filed" on March 6, 2007.

Second, Respondent contends that the postconviction court's September 24, 2007 dismissal without prejudice caused the clock to run again on the federal habeas one-year limitation period, and that period expired on September 26, 2007 making Petitioner's current petition untimely. DE 8 at 10. This Court disagrees. "[F]or the purposes of tolling under 28 U.S.C. § 2244(d)(2), a petitioner's Rule 3.850 motion is 'pending' until it is denied with prejudice." *Hall v. Sec'y, Dep't of Corr.*, 921 F.3d 983, 990 (11th Cir. 2019). Furthermore, under the "relation back doctrine," an amended 3.850 motion made pursuant to a dismissal with leave to amend relates back to the filing date of the original 3.850 motion. *Bryant v. State*, 901 So. 2d 810, 818 (Fla. 2005) (holding that an amendment "relates back" to the date of an initial motion where that motion is stricken with leave to amend). Here, Petitioner's 3.850 motion was dismissed without prejudice on September 24, 2007 and thus was still pending (DE 9-1 at 119). Pursuant to the court's order, Petitioner then filed a comprehensive amended 3.850 motion on December 13, 2007. *Id.* at 126. Therefore, Petitioner's comprehensive amended 3.850 motion relates back to the original 3.850 motion's filing date of March 6, 2007 with one-day remaining on the federal habeas clock.

Petitioner correctly argues that the entire period between the initial 3.850 motion filing date of March 6, 2007 and when the state appellate court issued its mandate on October 13, 2017 was tolled (DE 14 at 5-6). *See San Martin v. McNeil*, 633 F.3d 1257, 1266 (11th Cir. 2011) (citation omitted). Because October 13, 2017 was a Friday, the next business day was Monday, October 16, 2017. Consequently, the Court concludes that instant petition for writ of habeas corpus filed on October 16, 2017 is timely.

The exhaustion doctrine precludes federal habeas relief before a state prisoner fairly presents his constitutional claims in state court and exhausts remedies available in state court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842, 844 (1999); Title 28 U.S.C. § 2254(b). Here, Respondent does not challenge that Petitioner has exhausted his claims. Accordingly, this Court finds that Petitioner's claims are exhausted and will be reviewed on the merits.

## STANDARDS OF REVIEW

**A.** ***Standard Under the Antiterrorism and Effective Death Penalty Act***

Petitioner's federal habeas petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Title 28 U.S.C. § 2254(a) permits a federal court to issue "a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" if that custody is "in violation of the Constitution or laws or treaties of the United States." The issuance of a writ is limited, however, by the purpose of AEDPA, which is "to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (internal quotations and citations omitted). The AEDPA establishes a formidable barrier to state prisoners seeking federal habeas relief because it is based on the principle that "state courts are adequate forums for the vindication of federal rights." *See Downs v. Sec'y, Fla. Dep't of Corrs.*, 738 F.3d 240, 256 (2013).

Section 2254 applies at the end of a greater course of judicial review. Section 2254(d) assumes that the Petitioner already exhausted his claims using the state's postconviction avenues of relief to obtain an adjudication on their merits. The Eleventh Circuit directs the focus of inquiry to the last merits adjudication by the state court. As applied to this case, that is the unwritten PCA opinion that Florida's Fourth DCA rendered to affirm the denial of Petitioner's rule 3.850

postconviction motion (DE 9-1 at 309).  Even though the PCA adjudication is unwritten and thus gives no explanatory basis, it still counts as a merits determination, and it still is entitled to deference.  *See Reed v. Sec'y, Fla. Dep't of Corrs.*, 767 F.3d 1252, 1261 (11th Cir. 2014).

While the deference remains, the fact that the Fourth DCA offered no reasons for the affirmance does affect the scope of review.  In this situation, the reviewing federal court must "look through" to the last adjudication that does provide a relevant rationale.  *See Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).  As applied here, that means this Court looks through to Circuit Court Judge Levin's Order Denying Second Amended Rule 3.850 Motion that was filed on September 2, 2016, which based its denial on responses provided by the government and an earlier order relative to the denial of two grounds (DE 9-1 at 238-40).  This Court assumes that the appellate court adopted Judge Levin's reasoning and rationale.  *Wilson*, 138 S.Ct. at 1192.

The next step in the analysis is to identify the legal basis that entitles the Petitioner to habeas corpus relief.  That is, to identify the constitutional or federal law that was violated.  Section 2254(d)(1) narrows that inquiry down to "clearly established Federal law, as determined by the Supreme Court of the United States."  The phrase "clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's opinions in existence when the state court decided the postconviction claims.  *See Downs*, 738 F.3d at 256-57 (adding that it includes a binding circuit court decision that says whether the particular point in issue is clearly established Supreme Court precedent).  For a claim based on the ineffective assistance of counsel, for example, the governing standard comes from the Supreme Court's seminal *Strickland v. Washington*, 466 U.S. 668 (1984) opinion.

Section 2254(d)(1) asks whether the state court's denial was "contrary to" that clearly established Federal law.  The phrase "contrary to" means that the state court decision contradicts

the Supreme Court on a settled question of law or holds differently than the Supreme Court on a set of materially indistinguishable facts. *See Downs*, 738 F.3d at 257. A state court's decision can be contrary to the governing federal legal standard either in its result (the denial of relief) or in its reasoning.

Section 2254(d)(1) also asks the reviewing federal court to determine whether the state court's denial "involved an unreasonable application of" that clearly established federal standard. An unreasonable application of federal law is not the same as a merely incorrect application of federal law. *See Downs*, 738 F.3d at 257. It tests whether the state court's application of the legal principle was objectively unreasonable in light of the record before the state court at the time. An objectively unreasonable application of federal law occurs when the state court identifies the correct legal rule but unreasonably applies, extends, or declines to extend it to the facts of the case. *See Putnam v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).

Section 2254(d)(1) tests the legal correctness of the state court's decision, but it does so through a highly deferential lens. The degree of error must be substantial and beyond dispute. The state court's decision survives § 2254(d)(1) review so long as some fair-minded jurists could agree with the state court, even if others might disagree. *See Downs*, 738 F.3d at 257.

While subsection (1) of § 2254(d) tests the legal correctness of the state postconviction court's denial of relief against controlling federal case law, subsection (2) of § 2254(d) sets forth the standard by which a federal court reviews the state postconviction court's findings of fact. Section 2254(d)(2) asks whether the state postconviction court based its denial "on an unreasonable determination of the facts" based on the evidence before it at the time.

As with the § 2254(d)(1) legal analysis, a reviewing federal court is to consider the state court's findings of fact through a deferential lens. The state court's finding of fact is not

unreasonable just because the reviewing federal court would have reached a different finding of fact on its own. So long as reasonable minds might disagree about the finding of fact, the state court's finding stands. *See Downs*, 738 F.3d at 257. Indeed, the state court's fact determinations are presumed to be correct. Section 2254(e)(1) places the burden on the Petitioner to rebut that "presumption of correctness by clear and convincing evidence." Even if the state postconviction court did make a fact error, its decision still should be affirmed if there is some alternative basis sufficient to support it. *See Pineda v. Warden*, 802 F.3d 1198 (11th Cir. 2015).

Obviously then § 2254(d) creates a standard of review that is highly deferential to the state court's denial of the claim. The reviewing federal court must give the state postconviction court the benefit of the doubt and construe its reasoning towards affirmance. *See Lynch v. Sec'y, Fla. Dep't of Corrs.*, 776 F.3d 1209 (11th Cir. 2015). To warrant relief under § 2254(d), the Petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This is the degree of error the Petitioner must show before this Court may override the state postconviction court's decision and overturn the finality of the conviction and sentence.

### B. *Ineffective Assistance of Counsel*

AEDPA substantial deference applies to all issues raised in the pending petition. Under *Strickland*, an additional layer of deference applies to Petitioner's claims of ineffective assistance of counsel. *Strickland*, 466 U.S. at 684-85. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them. *Id.* Defendants in state court prosecutions have such right under the Fourteenth Amendment. *Minton v. Sec'y, Dep't of Corrs.*, 271 F. App'x 916, 918 (11th Cir. 2008).

When assessing counsel's performance under *Strickland*, the Court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 18 (2013). To prevail on a claim of ineffective assistance of counsel, Petitioner must demonstrate: (1) that his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness; and (2) that he suffered prejudice as a result of that deficient performance. *Strickland*, 466 U.S. at 687-88.

To establish deficient performance, Petitioner must show that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence. *Id.* at 690; *see Cummings v. Sec'y for Dep't of Corrs.*, 588 F.3d 1331, 1356 (11th Cir. 2009) ("To establish deficient performance, a defendant must show that his counsel's representation fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place."). A court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*), *cert. den'd*, 531 U.S. 1204 (2001). There are no absolute rules dictating what is reasonable performance because absolute rules would restrict the wide latitude counsel have in making tactical decisions. *Id.* at 1317. The test for ineffectiveness is not whether counsel could have done more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. *Id.* at 1316. Instead, to overcome the presumption that assistance was adequate, "a petitioner must 'establish that no competent counsel would have taken the action that his counsel did take.'" *Hittson*, 759 F.3d at 1263 (quoting *Chandler*, 218 F.3d 1305 at 1315).

Regarding the prejudice component, the Supreme Court has explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* A court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one of the prongs. *Id.* at 697. Further, counsel is not ineffective for failing to raise non-meritorious issues. *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001). Counsel is also not required to present every non-frivolous argument. *Dell v. United States*, 710 F.3d 1267, 1282 (11th Cir. 2013).

Further, a federal habeas court does not apply *Strickland* de novo, "but rather, through the additional prism of [Section 2254(d)] deference." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1126 (11th Cir. 2012). "Thus, under this doubly deferential standard, the pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. And if, at a minimum, fairminded jurists could disagree about the correctness of the state court's decision, the state court's application of *Strickland* was not unreasonable and [Section 2254(d)] precludes the grant of habeas relief." *Id.* (internal citation omitted); *but see Evans v. Sec'y, Dep't of Corrs.*, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (*en banc*) (Jordan, J., concurring) (explaining that double deference to a state court's adjudication of a *Strickland* claim applies only to *Strickland's* performance prong, not to the prejudice inquiry). "This 'double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Id.* (quoting *Evans v. Sec'y, DOC, FL*, 699 F.3d 1249, 1268 (11th Cir. 2012)).

**DISCUSSION**

Petitioner raises thirteen grounds for relief ("claims").  Twelve claims allege ineffective

assistance of trial counsel and one claim alleges trial error.  Petitioner's claims raise the following

issues:

**Claim 1:** Whether trial counsel was ineffective by not presenting expert testimony regarding the unreliability of the victims' voice identification of Petitioner (DE 1 at 11);

**Claim 2:** Whether trial counsel was ineffective when he failed to move to suppress Petitioner's June 10, 2003 alibi statements to law enforcement that Petitioner allegedly made in violation of his *Miranda* rights (DE 1 at 16);

**Claim 3:** Whether trial counsel was ineffective for failing to adequately inform Petitioner about his right to testify and prepare Petitioner to testify (DE 1 at 19);

**Claim 4:** Whether trial counsel was ineffective for failing to call a witness to impeach victim Hopkins as to Hopkins' ability to identify Petitioner's voice (DE 1 at 22);

**Claim 5:** Whether trial counsel was ineffective for failing to present three witnesses to impeach Hopkins' motives for testifying against Petitioner and to provide Petitioner with an alibi defense (DE 1 at 25);

**Claim 6:** Whether trial counsel was ineffective for failing to impeach Christopher as to inconsistencies in his statements about his voice recognition of Petitioner during the burglary (DE 1 at 28);

**Claim 7:** Whether trial counsel was ineffective for not ensuring that all of Petitioner's taped jail conversations were played for the jury to demonstrate that Hopkins was concerned that law enforcement would discover he was lying and that Hopkins was in love with Christy Ferguson (DE 1 at 30);

**Claim 8:** Whether trial counsel was ineffective for not objecting when the prosecution violated Petitioner's right of confrontation by playing for the jury taped conversations where Hopkins told Petitioner that Christy believed Petitioner was guilty and where Petitioner's mother told him she did not want to talk to him anymore (DE 1 at 32; DE 16-1 at 351, 521, 781-82, 786);

**Claim 9:** Whether trial counsel was ineffective by failing to ask for a curative instruction and/or failing to move for a mistrial when government witness Johnny

Rodriguez informed the jury that Petitioner was on probation at the time of the burglary (DE 1 at 36);

**Claim 10:** Whether trial counsel was ineffective for failing to sufficiently investigate whether a juror had improper contact with a government witness (DE 1 at 38);

**Claim 11:** Whether trial counsel was ineffective for not moving for a mistrial when the government shifted the burden of proof by implying that Petitioner's brother, Paul Rodriguez, would have been a better witness to testify as to Hopkins giving Petitioner his Rolex watch at a gathering on or about May 9, 2003 (DE 1 at 40);

**Claim 12:** Whether trial counsel's cumulative errors deprived Petitioner of a fair trial (DE 1 at 42);

**Claim 13:** Whether the trial court erred by failing to adequately inquire into Petitioner's motion to discharge counsel prior to sentencing (DE 1 at 43).

After reviewing the pleadings, for the reasons stated herein, this Court recommends that Petitioners motion be denied because Petitioner is not entitled to relief on the merits.

This Court addresses each claim in turn.  In claims 1-12, Petitioner challenges his conviction and sentence collaterally on the basis that his counsel was ineffective in defending him. Consequently, it is the *Strickland* opinion (and its subsequent interpretative case law) that sets forth and defines the actionable federal right at issue with respect to these claims.

### A. *Claim 1*

Claim 1 alleges that trial counsel was ineffective for not proffering an expert witness to challenge the reliability of the victims' voice identifications of Petitioner. Their voice identifications is a material point because it links the Petitioner to the crime scene and to the burglary. (DE 1 at 11-12).  Petitioner would have argued that the overall circumstances at the scene---"the use of a weapon, the short duration of the contact, multiple perpetrators, and because the identification was a cross-racial/cross-ethnic identification of the Hispanic [Petitioner] by Caucasian victims"---makes the victims' voice identifications unreliable.  *Id.*  The postconviction

court ultimately relied upon the government's arguments that 1) Petitioner did not demonstrate that the victims' identification would be called into question by such testimony from an unnamed expert, and 2) Petitioner failed to show prejudice because the jury heard both victims' testimony identifying Petitioner by voice and heard other evidence implicating Petitioner (DE 9-1 at 153, 238-39).  Indeed, Hopkins testified on direct and on cross that he definitely knew it was Petitioner who robbed him, and he also implicated Petitioner on the 911 call he made immediately after the break-in to his home (DE 16-1 at 336-39, 430).  Hopkins further testified on cross that he identified Petitioner by not only his voice but also by "[h]is size, his physique, his muscular build," and his "[v]ery round head."  *Id.* at 430.  Moreover, while Petitioner asserts that the voice identification was the primary tie between the Petitioner and the crimes, the prosecution identified Hopkins' Rolex watch as "a pretty incriminating piece of evidence."  *Id.* at 633.  During taped phone conversations heard by the jury, Petitioner first denied multiple times that he took or had Hopkins' Rolex watch and then later instructed his father in coded language on where to dig up the watch in his backyard so his father could return the watch to Hopkins.  *Id.* at 341-71, 514-22, 534-36, and 539.  Petitioner is merely speculating that an expert's testimony would have changed the jury's reliance on the victims' voice identification and other evidence implicating Petitioner.  Therefore, as Petitioner cannot show that the outcome of the proceedings would have changed if counsel had hired an expert witness, this claim should be denied.

### B.  *Claim 2*

Claim 2 alleges that trial counsel was ineffective by not moving to suppress Petitioner's June 10, 2003 statements purportedly made involuntarily to law enforcement claiming that Johnny Rodriguez and Lacey Coker would provide him with an alibi (DE 1 at 16).  The postconviction court agreed with the government that trial counsel's performance was not deficient under

*Strickland* because the record refuted Petitioner's claim that the statements were involuntary (DE 9-1 at 154, 238-39). Petitioner argues, however, that he is entitled to an opportunity to prove that the statements were made in violation of his *Miranda* rights (DE 1 at 17-19). Even if Petitioner could prove the statements were made to law enforcement involuntarily, the jury still would have learned about the attempted alibi because both Johnny Rodriguez and Johnny's girlfriend, Lacey Coker, testified that Petitioner had asked them to lie to give him an alibi (DE 16-1 at 484-85, 492, 537). Both Johnny and Lacey were questioned by law enforcement during the burglary's investigation and testified that they refused to provide Petitioner his requested alibi. *Id.* Petitioner also made a recorded phone call to Johnny from jail that was played for the jury where Petitioner confirmed with Johnny that Johnny and Lacey would provide him with an alibi. *Id.* at 496. Furthermore, in another recorded call to Hopkins that was played for the jury, Petitioner told Hopkins that he was at Johnny Rodriguez's house at the time of the burglary. *Id.* at 354-55. In light of the other evidence regarding this alibi, the jury could have reasonably concluded that Petitioner had, in fact, asked Johnny and Lacey to lie in order to provide him with an alibi. Moreover, suppression of the offending statements does not explain or negate the incriminating evidence against Petitioner relative to the Rolex watch. Petitioner denied having Hopkins' watch and then procured the return of the watch to Hopkins. *Id.* at 341-71, 514-22, 534-36, and 539. Petitioner cannot, therefore, show that the trial outcome would have differed if trial counsel had successfully suppressed the subject statements to law enforcement. Because Petitioner cannot establish prejudice under *Strickland*, this Court finds that Claim 2 provides no basis for relief.

### C. *Claim 3*

Petitioner argues that trial counsel was ineffective in claim 3 for the failure to adequately communicate with him about his right to testify and for the failure to prepare him to testify (DE 1

at 19).  The postconviction court adopted the government's argument that the record indicated that Petitioner acknowledged to the court his right to testify and informed the court that it was his decision not to testify (DE 9-1 at 155, 205, 238-39).  During the trial court's colloquy, Petitioner confirmed that he had discussed with trial counsel the advantages and disadvantages of testifying (DE 16-1 at 668).  Petitioner also stated that he understood it was his decision, and not his counsel's decision, as to whether or not he testified.  *Id.*  Petitioner fully acknowledged that he understood his right to testify and confirmed that it was his decision to not testify.  *Id.* at 668-69.  Given the record, Petitioner fails to demonstrate that his counsel's performance was defective.  Nonetheless, Petitioner contends that his testimony would have changed the trial's outcome because he would have professed his innocence, explained that Hopkins gave him the watch in exchange for drugs, that he was forced with threat of arrest to come up with an alibi, and that Hopkins set him up because Hopkins was in love with Christy Ferguson (DE 1 at 20).  As the government argued, however, Petitioner failed to acknowledge that he would have been impeached with three felony convictions for crimes of dishonesty, which would have been highly prejudicial given that his credibility was at issue (DE 16-1 at 155, 205).  Petitioner also does not explain why he denied having Hopkins' watch if Hopkins had already given it to him as collateral for a drug deal.  *Id.* at 341-71, 514-22, 534-36, and 539.  Because Petitioner fails to demonstrate his trial counsel's deficient performance and fails to demonstrate prejudice, this Court finds claim 3 without merit.

### D. *Claim 4*

Claim 4 alleges that trial counsel was ineffective by failing to impeach Hopkins with a witness who say that when Petitioner had called him once, Hopkins had mistaken Petitioner for someone else. That testimony thereby would call into question the ability of Hopkins to identify Petitioner by voice. (DE 1 at 22-25).  Even assuming counsel's performance was deficient, however,

Petitioner fails to show prejudice given the record in this case.  First, Hopkins testified that he identified Petitioner by means in addition to voice (DE 16-1 at 430).  Second, Christopher also testified that he identified Petitioner by voice having had multiple opportunities to do so during the burglary.  *Id.* at 460-61.  Third, the jury heard Petitioner's recorded statements telling Hopkins he did not take nor have Hopkins' watch, and then the jury heard him give his father coded instructions to dig up the watch and return the watch to Hopkins.  *Id.* at 341-71, 514-22, 534-36, and 539.  Petitioner does not explain why he denied having the watch nor why he tried to mask his instructions regarding the return of it to Hopkins.  Given this additional evidence implicating Petitioner, he does not show that the outcome of the trial would have differed given the impeachment of Hopkins as to his ability to recognize Petitioner's voice.  Thus, this Court finds that claim 4 lacks merit.

### E.  *Claim 5*

Petitioner alleges in claim 5 trial counsel's ineffectiveness for failing to present three witnesses to impeach Hopkins and to provide Petitioner with an alibi defense (DE 1 at 25-28).  Specifically, Petitioner contends that trial counsel should have called to the witness stand: 1) Christy Ferguson (his girlfriend) to testify that Hopkins had offered to help get the charges dropped if she slept with him, 2) Paul Rodriguez (his brother) to testify that Hopkins said "he would do whatever it takes to put [Petitioner] in prison," and 3) Lauren Casooth to testify that Petitioner was with her at the time of the burglary.  *Id.*  The postconviction court relied upon the government's argument that, *inter alia*, Petitioner failed to show prejudice from the omission of the purported testimony of the three witnesses (DE 9-1 at 156-57, 207, 238-39).  Here, the record supports the government's position that Petitioner fails to show prejudice.  Showing either that Hopkins had a motive for Petitioner to go to prison or that Petitioner had a female alibi witness whom he would not want his girlfriend,

Christy Ferguson, to know about does not explain why Petitioner denied that he had Hopkins' watch or why he later returned it in a manner that implicated him as guilty of the charges against him (DE 16-1 at 341-71, 514-22, 534-36, 539). Accordingly, this Court finds that Claim 5 provides no basis for relief.

### F. *Claim 6*

Claim 6 alleges that trial counsel was ineffective because he did not impeach Christopher with inconsistencies in the statements he made before and during trial regarding what Petitioner said during the burglary when he recognized Petitioner's voice (DE 1 at 28-30). As Christopher testified at trial, the Petitioner had asked, "where's the money at?" *Id.* at 28. In comparison the investigating deputy wrote in his report that Christopher only heard "where's the". At that time Christopher did not report hearing the full sentence. *Id.* The postconviction court concluded that the government was correct that Petitioner established neither deficient performance nor prejudice with this claim (DE 9-1 at 157, 238-39). As stated previously, under *Strickland*, trial counsel's performance is not deficient for failing to present every non-frivolous argument. *Dell v. United States*, 710 F.3d at 1282. Here, Petitioner fails to show that counsel was incompetent by not challenging Christopher regarding the minor inconsistency. Therefore, Petitioner fails to demonstrate deficient performance. Additionally, Petitioner fails to show prejudice because Christopher testified at trial that he had multiple opportunities to hear Petitioner's voice to identify him during the burglary, and Hopkins testified that he identified Petitioner by voice and by other means (DE 16-1 at 430, 460-61). Based upon the record, the jury could reasonably credit the victims' identifications. Therefore, this Court concludes that claim 6 is meritless.

### G. *Claim 7*

Petitioner alleges in claim 7 that trial counsel was ineffective because the jury did not hear all of the telephone conversations that the jail had taped. The full extent of those conversations would have shown Hopkins' concern about whether law enforcement would discover that he was lying and also would show Hopkins' love for Christy Ferguson (DE 1 at 30).  Petitioner argues that in one of his phone conversations, he told Hopkins that the case actually concerned a drug deal and that Hopkins did not deny that characterization and sounded concerned. *Id.* at 31.  Petitioner adds that on one of the calls, Hopkins told Petitioner to stay away from Christy Ferguson, which Petitioner claims shows that Hopkins was in love with her and had a motive for setting-up Petitioner to go to prison. *Id.*  As the government argued to the postconviction court, Petitioner's trial counsel did explore Hopkins' desire for Christy Ferguson in the cross-examination of Detective Colangelo. The jury thereby heard that information. (DE 9-1 at 156-57, 208).  Therefore, trial counsel does not appear incompetent for failing to ensure that the jury heard Hopkins tell Petitioner to stay away from Christy Ferguson.   Furthermore, even if the un-played phone calls impeached Hopkins in the manner Petitioner suggests, Petitioner fails to show prejudice because the jury could have reasonably discredited Petitioner's defense theory that Hopkins' accused Petitioner falsely.  For example, even if Hopkins had a motive for staging a burglary that implicated Petitioner, the record supports the fact that a burglary actually happened based upon the victims' 911 call and the testimony of the responding law enforcement officers. (DE 16-1 at 307-09, 332-36).  Also, the record supports that both Hopkins and his son, Christopher, identified Petitioner as a burglar. *Id.* at 322, 335-36, 430, and 460-61.  Moreover, impeachment of Hopkins does not overcome the evidence that the jury heard where Petitioner repeatedly denied having Hopkins' watch and then gave coded instructions to his father to dig up the watch and return it to Hopkins.

*Id.* at 341-71, 514-22, 534-36, and 539.  Because Petitioner fails to show that impeaching Hopkins with the referenced taped conversations would have changed the trial outcome, this Court finds that claim 7 provides no basis for relief.

### H.  *Claim 8*

Claim 8 alleges ineffectiveness of trial counsel for failing to object to the proffer of taped conversations where (1) Hopkins said that Christy Ferguson had told him that she believed Petitioner to be guilty and where (2) Petitioner's mother said that she did not want to speak to him anymore (DE 1 at 32; DE 16-1 at 351, 521, 781-82, 786).  The postconviction court relied upon the government's arguments that, among other things, Petitioner failed to show prejudice (DE 9-1 at 159-60, 208-09).  Petitioner speculates that the trial court would have granted a mistrial if trial counsel had moved for one (DE 1 at 33).  Such speculation does not, however, establish trial counsel's deficient performance under *Strickland*.  Furthermore, even if the offending statements had been redacted, their absence would not overcome the other evidence before the jury such as Petitioner arranging the return of Hopkins' watch after denying he took it or had it (DE 16-1 at 341-71, 514-22, 534-36, 539).  As the government argued, Petitioner does not demonstrate that, but for counsel's failure to object to the playing of these statements for the jury, there is a reasonable probability that the outcome of the proceeding would have been different.  Thus, claim 8 is without merit.

### I.  *Claim 9*

For Claim 9, Petitioner alleges trial counsel ineffectiveness for not moving for a mistrial or for a curative instruction in response to Johnny Rodriguez' testimony that Petitioner was on probation at the time of the burglary (DE 1 at 36).  The government correctly argued that Petitioner would not have been entitled to a mistrial because the witness's statements were reasonable responses to

questions asked by Petitioner's trial counsel (DE 9-1 at 160).  *Terry v. State*, 668 So. 2d 954, 962–63 (Fla. 1996).  When trial counsel cross-examined Johnny Rodriguez, trial counsel tried to get him to acknowledge how the Petitioner might have used him as an alibi witness (the alibi being that the Petitioner was out cheating on Christy Ferguson on the night of the burglary). That line of inquiry relied on his familiarity with the Petitioner. (DE 16-1 at 542).  Johnny Rodriguez attempted to qualify how well he truly knew the Petitioner by saying, "[h]e's only been out for – I only started hanging out with him for a couple of months since he's been out last time – from the period – I've only seen him a couple of times."  *Id.*  Later in the cross-examination, trial counsel attempted to have Johnny Rodriguez quantify the amount of money buried in the backyard as more than two or three-hundred dollars.  *Id.* at 545-46.  In response to trial counsel's question about the amount of money needed to bond Petitioner out on a prior gun charge, Johnny answered that there was no bond.  *Id.* at 546.  Trial counsel then asked, "[a]nd at the time he was arrested, he was held on no bond, is that what you were saying?"  *Id.*  Johnny then responded, "[y]eah, I believe so, violation of probation."  This Court agrees that the responses were reasonable in light of the questions asked.  Therefore, Petitioner was not entitled to a mistrial on this basis.  Moreover, a curative instruction, as the government argues, could have drawn more attention to these statements and caused more prejudice than simply moving on, as trial counsel did (DE 9-1 at 160).  Finally, as this Court has previously noted, the jury heard the Petitioner on tape giving coded instructions to his father to dig up Hopkins' Rolex watch, which Petitioner had buried in his backyard, and to return it to Hopkins (DE 16-1 at 341-71, 514-22, 534-36, 539).  Given the evidence in the record against the Petitioner, it is improbable that, but for a curative instruction regarding Johnny Rodriguez's statements about Petitioner's probationary status, the trial's outcome would have been different.  Because Petitioner fails to demonstrate prejudice, this Court finds claim 9 should be denied as a basis for relief.

### J. *Claim 10*

Petitioner alleges in Claim 10 that trial counsel was ineffective because he did not sufficiently investigate whether a juror had improper contact with a deputy law enforcement officer who the prosecution was calling as a witness (DE 1 at 38).   The postconviction court denied this claim finding no reason to infer that the contact was improper. The contact was limited to the juror asking the deputy where she was supposed to go. (DE 9-1 at 189).   The record supports the state postconviction court's conclusion that any impropriety from that contact is too speculative.   The trial judge had reported the contact to counsel. During a recess, the trial judge informed counsel that a juror had reported asking the witness whether she was in the right courtroom (DE 16-1 at 383).   Petitioner's trial counsel was satisfied that the juror had properly reported the exchange and that nothing more than a confirmation as to whether the juror was in the right place was discussed. *Id.* at 384.   The court requested the prosecution to confirm with the deputy that nothing more was discussed.  *Id.* at 385.   On this record, there is nothing to indicate trial counsel's performance was deficient.   Additionally, Petitioner fails to make any showing that the outcome of the trial would have been different if defense counsel had asked the court to further question the juror and the deputy.   Accordingly, this Court finds claim 10 meritless.

### K. *Claim 11*

Claim 11 alleges that trial counsel was ineffective for failing to move for a mistrial when the prosecution engaged in burden-shifting. The prosecution implied that Petitioner should have called his brother, Paul Rodriguez, to testify that Hopkins had given Petitioner his Rolex watch in early May of 2003 (DE 1 at 40).   The implication arose from prosecution's cross-examination of defense witness Timothy Hernandez. Timothy Hernandez described a watch transaction that took place in a bathroom. Timothy Hernandez did not go into the bathroom, and thus he did not see first-hand

the watch transaction. However he identified Paul Rodriguez as someone who was present to see it take place first-hand. The implication was to fault the Petitioner for not calling that first-hand witness, Paul Rodriguez, to the stand. (DE 16-1 at 683-84).  Trial counsel objected, and the Court gave a curative instruction to the jury.  *Id.* at 684-85.  The postconviction court denied this claim by incorporating the government's responses and adopting the government's reasoning noting that trial counsel objected to the burden-shifting and that the trial court gave a curative instruction that the Petitioner does not bear the burden of proof. (DE 9-1 at 235).  The government correctly argued that mistrial would have been properly denied based upon the curative instruction among other reasons.  *Id.* at 161 (citing *Thomas v. State*, 726 So. 2d 369, 372 (Fla. 4th DCA 1999)).  Additionally, the jury is presumed to have followed the trial court's instructions.  *Raulerson v. Wainwright*, 753 F.2d 869, 876 (11th Cir. 1985).  Petitioner alleges nothing to overcome that presumption.   Therefore, Petitioner shows neither deficient performance nor prejudice.  Accordingly, for the reasons stated, Petitioner fails to establish that the allegations in claim 11 provide a basis for relief.

### L. *Claim 12*

Petitioner alleges in Claim 12 that the cumulative errors of trial counsel deprived Petitioner of a fair trial (DE 1 at 42).  Claims found to be without merit, however, cannot be aggregated to show denial of a constitutional right.  *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012).  Because the Petitioner's ineffective assistance of trial counsel claims individually lack merit, then by extension they lack merit cumulatively. Consequently claim 12 has no merit either.

### M. *Claim 13*

Claim 13 alleges that the trial court erred by failing to conduct a full and complete inquiry into Petitioner's motion to discharge counsel prior to sentencing (DE 1 at 43).  Petitioner claims, as he

did on direct appeal, that he is entitled to be resentenced because the trial court did not conduct a *Nelson* inquiry pre-sentencing as to Petitioner's complaint about attorney incompetence (DE 1 at 43-44; DE 9-1 at 59).  The government correctly argued in their appellate brief that the trial court did not err because Petitioner did not make an unequivocal request to discharge counsel (DE 9-1 at 77 (citing *Logan v. State*, 846 So.2d 472, 477 (Fla. 2003) (holding that "the requirements of *Nelson* depend upon a clear and unequivocal statement from the criminal defendant that he wishes to discharge counsel").  Here, Petitioner did not make an unequivocal statement that he wished to discharge counsel (DE 1 at 43; DE 9-1 at 74).  Accordingly, this Court finds that the allegations in Claim 13 provide no basis for relief.

## EVIDENTIARY HEARING

A federal court must consider an evidentiary hearing if such a hearing could enable a habeas petitioner the opportunity to prove factual allegations, which, if true, would confer the right to habeas relief.  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  This Court begins by considering whether 28 U.S.C. § 2254(e) bars an evidentiary hearing. First, § 2254(e)(2) bars an evidentiary hearing if the Petitioner had failed to develop the factual basis of his claims in the state court proceedings.  Here, Petitioner fully developed all but claim 13 in the state courts, and claim 13 was effectively waived due to being untimely filed in the state courts.  This Court found the state court record adequate to resolve the remainder of Petitioner's claims on the merits.

This Court considers next the standard that governs the decision of whether to hold an evidentiary hearing when the limitations of § 2254(e) do not apply. The decision whether to grant an evidentiary hearing is left to this Court's discretion. This Court must review the available record and determine whether an evidentiary hearing is warranted. To guide the determination, the Eleventh Circuit directs this Court to consider four factors. First, this Court must consider whether

there are disputed facts concerning the Petitioner's claims for which the Petitioner did not receive a full and fair hearing from the state postconviction court. Second, this Court must consider whether the Petitioner's fact allegations, if he could prove them true, would entitle him to prevail on his Petition. Third, in making that determination of whether the Petitioner can prevail on the merits of his claims, this Court also must keep in mind the deference that § 2254 gives to the state postconviction court's ruling. Fourth, this Court must consider the nature of the Petitioner's fact allegations. If they are merely conclusory and unsupported by specifics, the evidentiary hearing request may be denied. See Boyd v. Allen, 592 F.3d 1274, 1304-05 (11th Cir. 2010). The present record presents no disputes of fact that require resolution. This Court was able to assess Petitioner's claims based on the record as it is without the need to develop it further.

## CONCLUSION

The record shows that the Petitioner received the full benefit of a jury trial where he was able to challenge the state's case against him and to proffer conflicting and exonerating evidence. Even if there were ways his trial counsel could have presented his defense better (viewed, of course, with the benefit of hindsight and with knowledge of the jury's decision), the record does not show how any of those potential shortcomings constitute ineffective assistance as Strickland defines it. Even if there were ways that trial counsel could have done a better job, none of those complained-of errors detract from the strength of the state's case-in-chief. Because the Petitioner cannot demonstrate how the complained-of errors would have resulted in a more favorable outcome, he does not prevail on his claims for relief. Moreover the Petitioner does not overcome the deference given to the state court determinations and the deference given to trial counsel to show a meritorious claim of ineffective assistance.

**ACCORDINGLY**, this Court recommends to the District Court that the Petition for Writ of Habeas Corpus (DE 1) be **DENIED**.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Jose E. Martinez, the United States District Judge assigned to this case. Failure to file timely objections shall bar the parties from a de novo determination by the District Court of the issues covered in this Report and Recommendation and bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745, 749—50 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988).

**DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida, this ___ day of November, 2019.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE